## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**PATTI LEMMON,**

              **Plaintiff,**

**-v-**

**RICHARD AYRES, et al.,**

              **Defendants.**

**Case No. 3:09-CV-361**

**Judge Thomas M. Rose**

_____

### ENTRY AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. #26) AND TERMINATING THIS CASE
_____

The Complaint in this matter was originally filed in the Court of Common Pleas of Clark County, Ohio by Plaintiff Patti Lemmon ("Lemmon"). It was subsequently removed to this Court by Defendants Richard Ayres ("Ayres") and Ayres Accounting Company ("Ayres Accounting") based upon this Court having federal question jurisdiction over at least one of Lemmon's Causes of Action.[1] (Doc. #1.)

Lemmon brings fifteen (15) claims as a result of her relationship with Ayres and Ayres Accounting. Her First Cause of Action is for breach of an oral agreement. Her Second Cause of Action is for unjust enrichment. Her Third Cause of Action is for promissory estoppel. Her Fourth Cause of Action is for negligent misrepresentation. Her Fifth Cause of Action is for negligent concealment of facts. Her Sixth Cause of Action is for fraudulent misrepresentation of facts. Her Seventh Cause of Action is for fraudulent concealment of facts. Her Eighth Cause of Action is for intentional infliction of emotional distress ("IIED"). Her Ninth Cause of Action is

_____

[1]Lemmon's Complaint was also brought against John Does 1-3 but no additional defendants have been identified.

for assault and her Tenth Cause of Action is for battery. Her Eleventh Cause of Action is for

sexual harassment. Her Twelfth Cause of Action is for failure to pay overtime wages as required

by the Fair Labor Standards Act ("FLSA"). Her Thirteenth Cause of Action is for failure to pay

overtime wages as required by Ohio Revised Code § 4113.03. Her Fourteenth Cause of Action is

against Ayres Accounting for vicarious liability, and her Fifteenth Cause of Action is against

Ayres Accounting for negligent training and/or supervision.

Now before the Court is a Motion for Summary Judgment made by Ayres and Ayres

Accounting. (Doc. #26) This Motion is now fully briefed and ripe for decision. A relevant

factual background will first be set forth followed by the standard of review for motions for

summary judgment and an analysis of the Motion.

## RELEVANT FACTUAL BACKGROUND

For purposes of a motion for summary judgment, the Court views the facts in a light most

favorable to the non-moving party, Lemmon in this case. A brief description of the Parties will

be followed by a description of the Parties' professional and personal relationships.

### The Parties

### Lemmon

Lemmon is a resident of Champaign County, Ohio. (Deposition of Patti Lemmon

("Lemmon Dep.") 5, January 25, 2011.) She was employed by Ayres Accounting from July of

1998 to November of 2008 as a staff accountant. (Lemmon Dep. at 23, 39; Deposition of Richard

Ayres ("Ayres' Dep.") 45, August 25, 2011.) In addition to her employment at Ayres

Accounting, Lemmon served as manager of Ayres' Subway franchise from October of 2005 to

October of 2008. (Lemmon Dep. at 30, 57.) Lemmon divorced in 2008 and was unmarried

thereafter. (Id. at 13.)

Lemmon's duties at Ayres Accounting included keeping accounting records, preparing financial reports, and preparing, and amending when necessary, all types of tax returns for certain clients. (Lemmon Dep. 26; Ayres Dep. 29.) All of the clients assigned to her considered Lemmon to be their primary contact for Ayres Accounting. (Lemmon Dep. 29; Ayres Dep. 29-30.) Her work at Ayres Accounting also included various ancillary duties, such as organizing seminars and overseeing some operations at a carryout Mr. Ayres owned. (Ayres Dep. 29-31; Lemmon Dep. 25-35.) Lemmon normally performed these ancillary duties during her normal work hours of 8:30 a.m. – 5:00 p.m. daily. (Ayres Dep. 28, 38.)

Lemmon occasionally worked at Ayres' Subway outside of her normal hours at Ayres Accounting including Saturdays and Sundays. (Lemmon Dep. 49-51, 202; Ayres Dep. 51-55.) Lemmon did not document all of her time working at the Subway franchise and on one occasion, in the middle of October of 2008 which is toward the end of her employment, she informed Ayres that compensation would be necessary. (Lemmon Dep. 209.)

Ayres asserts that Lemmon was compensated for all these various duties through her wages at Ayres Accounting. (Ayres Dep. 27-28.) In some instances, Lemmon worked less than her normal forty hours in a week. (Lemmon Dep. 236.) However, regardless of the deficiency, Lemmon was compensated for a full forty hours. (Id.)

Ayres compensated Lemmon for the extra efforts through the bonuses, a retirement plan, and an increase in base salary. (Ayres Dep. 58.) Ayres also compensated Lemmon for the extra efforts by reducing the rent that she was paying him for a property that she lived in by approximately $150 per month. (Ayres Dep. 58; Lemmon Dep. 141.)

-3-

Early on during her employment at Ayres Accounting, Lemmon was paid on an hourly basis. (Affidavit of Richard E. Ayres ("Ayres Aff.") Sept. 21, 2011.) Starting from 2006, Lemmon was paid on a salary basis. (Id.)

Between October of 2005, when the Subway opened, and October of 2008, Ayres paid Lemmon the equivalent of eighty hours per pay period even when Lemmon recorded less than eighty hours. (Lemmon Dep. 243-44. Ayres Dep. 118.) Lemmon eventually sought additional compensation in October of 2008 when the relationship between her and Ayres had fizzled. (Lemmon Dep. 209.)

### Ayres

Ayres is a resident of the Clark County, Ohio. (Ayres Dep. 4, 6.) He is the owner and a shareholder of Ayres Accounting & Company. (Id. at 19, 21.) At all times relevant herein, Ayres owned a Subway franchise in North Hampton, Ohio, in the name of Richard E. Ayres, LLC. (Id. at 19, 21.) He also has several rentals and presents tax seminars each fall called Ayres Tax Seminars ("ATS"). (Id. at 20.) Finally, Ayres was previously divorced and is currently married since 1964. (Id. at 7.)

### Ayres Accounting

Ayres Accounting is a business started by Ayres in 1966 and located in North Hampton, Ohio. (Id. at 13-14.) Ayres Accounting has four shareholders: Ayres, his spouse, and his two daughters. (Id. at 21.) The company provides financial services including preparation of tax and financial reports, management advisory services, and accounting related functions. (Id. at 14.) Ayres Accounting employs various individuals who perform different functions for the company. (Id. at 16-19.)

-4-

**The Relationships**

Prior to opening the Subway franchise, Ayres discussed the prospect of owning and opening a franchise with Lemmon. (Ayres Dep. 22; Lemmon Dep. 31.) In order to become well versed in the management of the Subway franchise, Lemmon attended classes at the national headquarters of Subway in Connecticut to be certified as a Subway manager. (Ayres Dep. 25; Lemmon Dep. 32.) Lemmon was provided her normal weekly pay for attending the class through Ayres Accounting. (Ayres Dep. 26.) She was also reimbursed for the class fee and other travel expenses. (Id. at 26.)

The Subway was opened on October 7, 2005, and Lemmon took on general duties as the Manager. (Ayres Dep. 22-23; Lemmon Dep. 31-32; 38.) Lemmon was responsible for overseeing the operations of the Subway franchise. (Ayres Dep. 24, Lemmon Dep. 49-51.) Her duties included the hiring and firing of employees, taking care of purchases and supplies, and other ancillary duties specific to the Subway business. (Id.) Lemmon had sole decision-making authority and discretion in her responsibilities as the manager of the Subway franchise. (Lemmon Dep. 55-57.)

Sometime after the opening of the Subway, Ayres promised Lemmon that he would someday transfer the property that the Subway franchise was on to her. (Ayres Dep. 64; Lemmon Dep. 74-75.) In her deposition, Lemmon discusses gifting of the Subway. (Lemmon Dep. 82.) In his deposition, Ayres discusses gifting of the property upon which the Subway was located. (Ayres Dep. 64.) Lemmon testified that, at the time the promise was made, there was no discussion about additional compensation for her work at the Subway. (Lemmon Dep. 85.)

At the time he made this promise, Ayres' intent was to gift the Subway to Lemmon regardless of whatever may or could potentially transpire in their personal relationship. (Ayres Dep. 65; Lemmon Dep. 82.) On or about June of 2006, to solidify his intentions of taking care of Lemmon as gratitude for her dedication and in hopes of a long-term relationship, Ayres made out a will where he bequeathed the Subway real estate to Lemmon upon his death. (Ayres Dep. 66-68; Lemmon Dep. 81.) Since then, Ayres has revoked the clause in his will that gave the Subwy real estate to Lemmon. (Ayres Dep. 66.)

Lemmon questioned whether Ayres intended to give the Subway to her. (Lemmon Dep. 149.) Sometime after the Subway opened, acting on the advice of her financial advisor, Lemmon approached Ayres about the possibility of having the first option to purchase the real estate in the event of a sale. (Ayres Dep. 71; Lemmon Dep. 79-80.) Ayres refused Lemmon's request and Lemmon never inquired further. (Ayres Dep. 71; Lemmon Dep. 79, 149-52.) Lemmon's uncertainty regarding Ayres' intent was based on Ayres' refusal of her purchase offer and his continuing relationship with his wife. (Lemmon Dep. 152, 160-61.) Thereafter, Lemmon continued working at the Subway franchise and eventually stopped managing the Subway franchise in October of 2008. (Id. at 57.)

Sometime during Lemmon's employment, she and Ayres began a romantic relationship. (Lemmon Dep. 59-62. Ayres Dep. 94.) There is conflicting testimony as to whether the relationship began before or after the opening of the Subway franchise.[1] (Lemmon Dep. 59-61; Ayres Dep. 96.) During the course of the romantic relationship, both Ayres and Lemmon

---

[1] Ayres testifies that the relationship began in 2003, fives year prior to Lemmon leaving Ayres Accounting. (Ayres Dep. 96.) Lemmon testifies that the relationship began somewhere around the end of 2005 and the beginning of 2006. (Lemmon Dep. 59-61.)

engaged in consensual physical contact. (Lemmon Dep. 136; Ayres 94.) Lemmon at times initiated sex with Ayres, including oral sex. (Lemmon Dep. 136.) They slept together two (2) nights a week on average. (Id. at 138.) Lemmon also had a physical relationship with another individual for a short period of time. (Id. at 171-72.)

Lemmon describes incidents or categories of incidents where she was touched by Ayres. First, she testifies that Ayres would put his hand down her shirt. (Id. at 164-67.) She also describes incidents where Ayres would come up from behind and kiss her. (Id.) In addition, there was a time at the Subway when Lemmon was physically disabled and Ayres held her head and kissed her. (Id. at 172-80.)

In June 2008, Ayres suffered a heart attack. (Ayres Dep. 97; Lemmon Dep. 115, 167-68.) While he was hospitalized, Lemmon visited Ayres in the hospital. (Lemmon Dep. 115-116; 97-98.) Ayres testified that, while Lemmon visited him at the hospital, they had a conversation whereby Lemmon inquired about the transfer of the Subway franchise. (Ayres Dep. 97-98.) Lemmon testified that she has no recollection of a conversation about the transfer of the Subway. (Lemmon Dep. 115-16.)

Shortly thereafter, the romantic relationship between Ayres and Lemmon ended. (Lemmon Dep. 67; Ayres Dep. 97.) Neither Ayres nor Lemmon verbally stated that the relationship was over. (Lemmon Dep. 67; Ayres Dep. 98.) Ayres's actions, however, remained consistent with what he would normally do during the course of their relationship. (Lemmon Dep. 170.)

In some instances during their relationship, Ayres asked whether he could initiate physical contact. (Lemmon Dep. 175.) Although not afraid or apprehensive of any threat of

physical harm, Lemmon did not refuse or object to Ayres' advances. (Lemmon Dep. 168-69.) Following the ending of their relationship, Ayres and Lemmon did not engage in any form of sexual intercourse. (Ayres Dep. 106-7.)

The professional relationship between Ayres and Lemmon ended sometime in 2008. (Lemmon Dep. 39; Ayres Dep. 122.) On November 12, 2008, Ayres and Lemmon met to discuss a possible employment termination.[2] (Lemmon Dep. 190-22; Ayres Dep. 116.) Ayres offered Lemmon $4,500, an uncontested unemployment request and a letter of recommendation. (Lemmon Dep. 120-21; Ayres Dep. 116.) Lemmon refused Ayres' offers. (Lemmon Dep. 121.)

Ayres did not fire Lemmon from her position at Ayres Accounting. (Lemmon Dep. 125; Ayres Dep. 122.) Lemmon left her position at Ayres Accounting on her own accord. (Lemmon Dep. 125-26; Ayres Dep. 122.)

Following her departure from Ayres Accounting, Lemmon testifies that she suffered emotional distress. (Lemmon Dep. 185.) Due to a lack of insurance, Lemmon did not seek out any treatment for the emotional distress. (Id. at 185-86.) Furthermore, Lemmon did not investigate any sources of treatment that would not have cost any out of pocket expenses. (Id. at 187.)

On August 19, 2009, Lemmon filed the lawsuit that is now before the Court. Lemmon filed this lawsuit because she is seeking, among other things, compensation for the time she worked at the Subway. (Lemmon Dep. 38.)

## STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by

---

[2] The depositions discuss a letter dated November 12, 2008. However, an actual copy of the letter has not been submitted and is not part of the Rule 56 evidence.

Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

-9-

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, declarations, stipulations, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c)(1)(A).

## ANALYSIS

Lemmon has brought fifteen (15) causes of action and Ayres and/or Ayres Accounting has moved for summary judgment on each of them. Thus, each of Lemmon's Causes of Action

will be addressed seriatim.

## Breach of an Oral Agreement

In her First Cause of Action, Lemmon alleges that an oral agreement existed between her and the Defendants in which the Defendants were to compensate her for her work at the Subway and/or were to transfer the Subway franchise to her, and that the Defendants breached this oral agreement. The Defendants respond that no enforceable contract existed between Lemmon and Ayres, and that Lemmon was compensated for her work at the Subway.

## Relevant Legal Provisions

Under Ohio law, the elements of a breach-of-contract claim are: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. *Thomas v. Publishers Clearing House, Inc.*, 29 F. App'x 319, 322 (6th Cir. 2002). To prove the existence of a contract, the plaintiff must prove all of the essential elements of a contract. *MMK Group, LLC v. SheShells Company, LLC*, 591 F. Supp.2d 944, 963 (N.D. Ohio 2008).

This dispute involves an oral agreement. The existence of an actionable oral agreement depends upon mutual assent as to the essential terms of the agreement. *GEM Industrial, Inc. v. Sun Trust Bank*, 700 F. Supp.2d 915, 921 (N.D. Ohio 2010)(citing *Kostelnik v. Helper*, 770 N.E.2d 58 (Ohio 2002)). The essential terms include the identity of the parties to be bound, the subject matter of the contract, consideration, quantity and price. *Id.*(citing *Alligood v. Procter & Gamble Co.*, 594 N.E.2d 668 (Ohio Ct. App. 1991)).

Mutual assent to an oral agreement is shown not by an express offer and acceptance, but by the surrounding circumstances including the conduct and declarations of the parties. *Id.* at

922. The surrounding circumstances must permit the court to infer that an actionable oral agreement exists as a matter of tacit understanding. *Id.* If the manifestations of the parties do not enable the court to determine what the agreement is and to enforce the agreement without, in effect, making a contract for the parties, there is no enforceable agreement. *Id.*(citing *Litsinger Sign Co. v. American Sign Co.*, 227 N.E.2d 609 (Ohio 1967)).

Consideration, an essential element of an actionable oral agreement, consists of either a benefit to the promisor or a detriment to the promisee. *Bono v. McCutcheon*, 824 N.E.2d 1013, 1017 (Ohio Ct. App. 2005). The detriment or benefit does not need to be great but it must be bargained for. *Id.* Finally, whether there has been consideration is for the court to decide. *Id.*

A detriment or benefit is bargained for if it is sought by the promisor in exchange for the promise and is given by the promisee in exchange for that promise. *Id.* For example, gratuitous promises are not enforceable as contracts because there is no consideration. *Id.* Likewise, conditional gratuitous promises, which require the promisee to do something before the promised act or omission will take place, are not enforceable. *Id.*

Where an agreement contemplates further action toward formalization or if an obligation to become binding rests on a future agreement to be reached by the parties so that either party may refuse to agree, there is no actionable agreement. *Westwinds Development Corp. v. Outcalt*, No. 2008-G-2863, 2009 WL 1741978 at *5 (Ohio Ct. App. Jun. 19, 2009). Said another way, as long as both parties to a contract contemplate that something remains to be done to establish a contractual relationship, there is no binding contract. *Id.*

**Analysis**

As an initial matter, Ayres had no authority to promise a Subway franchise to Lemmon

-12-

because only Subway could grant a franchise. Lemmon does not argue otherwise. Therefore, only an alleged oral promise to transfer the underlying land that the Subway sits on and the Subway buildings will be further considered. The underlying land and the Subway buildings will hereinafter be referred to as the "Subway real estate."

As another initial matter, Lemmon asserts that the alleged oral agreement included a promise to monetarily compensate her for work at the Subway. However, there is no evidence that Ayres made an oral promise to compensate Lemmon for work at the Subway, and Lemmon testified that he did not. (Lemmon Dep. 85.) Thus, Lemmon's breach-of-contract claim regarding compensation for work at the Subway is without merit.

Remaining is an analysis of the alleged promise to transfer the Subway real estate in return for managing the Subway. Lemmon testified that she had an agreement with Ayres to manage the Subway and, in return, the Subway was to be hers someday. (Id. at 74-75.) Lemmon also testified that there was a little house on the Subway property that she was to receive. (Id. at 75.) In addition, she testified that she had no obligations under the oral agreement and that there were no additional terms to the oral agreement. (Id. at 75, 82.)

Ayres confirmed that he promised to transfer the Subway real estate to Lemmon. (Ayres Dep. 64.) He also testified that he wanted to give the Subway real estate to Lemmon because of her dedication to him and the relationship that they had together. (Id. at 66.) Ayres specifically testified that he wanted to "take care of her." (Id. at 67.) Thus, there are no genuine issues of material fact that Ayres promised to transfer the Subway real estate to Lemmon. There are, however, issues of fact as to whether an actionable promise was made in return for managing the Subway.

-13-

The analysis turns to whether Ayres' promise was an enforceable contract. Generally, a promise to do something in the future is not an enforceable contract due to the lack of consideration. There are genuine issues of material fact as to whether there was consideration, i.e. managing the Subway. However, the Statute of Frauds precludes transfer of the Subway real estate regardless of whether there was consideration.

The Statute of Frauds[3] regarding a promise to convey real estate precludes an oral contract to transfer land but it may be overcome by part performance. *Delfino v. Paul Davies Chevrolet, Inc.*, 209 N.E.2d 194, 198 (Ohio 1965); *Geiger v. Geiger*, No. 13841, 1993 WL 476247 at *4 (Ohio Ct. App. Nov. 16, 1993). Thus, a party seeking to enforce an oral agreement to transfer real estate may overcome the Statute of Frauds if he or she establishes by clear and convincing evidence that he or she has performed acts which are unequivocally referable to the alleged oral agreement and which have changed his or her position to his or her detriment and made it impossible to place the parties in status quo. *Delfino*, 209 N.E.2d at 198.

Traditionally, Ohio courts have considered some or all of the following to meet the requirement that the party seeking to avoid the Statute of Frauds with regard to real estate must establish: evidence of a change in who possesses the real estate; payment of all or part of the consideration for the real estate; or improvements or alterations or repairs upon the real estate. *Geiger*, 1993 WL 476247 at *4. However, the performance of services is not considered part

---

[3]Ohio's Statute of Frauds provides that no interest in property can be assigned or granted "except by deed, or note in writing, signed by the party assigning or granting it…" Ohio Rev. Code § 1335.04. Ohio's Statute of Frauds also provides that no action may be brought upon an agreement that is not to be performed within one year from the making thereof unless the agreement is in writing and signed by the party to be charged therewith. Ohio Rev. Code § 1335.05. However, a promise unlikely to be performed within a year which is, in fact, not performed within a year is not within the Statute of Frauds if, at the time of the making, there is a possibility that the promise can be entirely performed as the parties intended within a year. *Weiper v. W.A. Hill & Associates*, 661 N.E.2d 796, 805 (Ohio Ct. App. 1995)(citing *Bryan v. Looker*, 640 N.E.2d 590, 594 (Ohio Ct. App. 1994)).

performance if the services can readily be valued in money. *Mays v. Dunaway*, No. 19922, 2003 WL 22972504 at *5 (Ohio Ct. App. Dec. 19, 2003).

In this case, there is evidence that Lemmon, based upon Ayres' oral promise, continued to manage the Subway with the intention that someday the Subway real estate would be hers. However, Lemmon has identified no evidence that Ayres put this agreement or promise to transfer real estate in writing to her. An agreement or promise to transfer real estate that is not in writing is void because it violates Ohio's Statute of Frauds.

Yet, Lemmon can avoid the Statute of Frauds if she shows that she performed acts which are unequivocally referable to the alleged oral agreement and that she has changed her position to her detriment. The only act which Lemmon alleges that she performed in reliance upon Ayres' alleged promise is managing the Subway. However, managing the Subway is a service which can readily be valued in money. Thus, Lemmon cannot get around the Statute of Frauds by showing that she managed the Subway in reliance upon Ayres' promise.

## Conclusion

There is no evidence that Ayres made an oral promise to Lemmon to monitarily compensate her for working at the Subway. Thus, Lemmon's breach-of-contract claim regarding monetary compensation for work at the Subway is without merit. Further, while there is evidence that Ayres made an oral promise to Lemmon to transfer the Subway real estate to her, there is no evidence that said promise was in consideration for managing the Subway. The oral promise to transfer the Subway real estate is not actionable because it is precluded by Ohio's Statute of Frauds. There are no genuine issues of material fact and Ayres and Ayres Accounting are entitled to judgment as a matter of law on Lemmon's First Claim for Relief for breach of an oral

-15-

agreement.

## Unjust Enrichment

In her Second Cause of Action, Lemmon alleges that the Defendants received the benefit of her labor at her expense and under circumstances that would make it unjust for the Defendants to retain this benefit without payment to her. Specifically, Lemmon asserts that she was not compensated for work at the Subway. The Defendants respond that Lemmon was compensated for her work at the Subway.

### Relevant Legal Provisions

"Unjust enrichment is an equitable doctrine that permits a party to pursue the reasonable value of services rendered upon another party when a benefit is conferred without an exchange of just compensation." *MMK Group*, 591 F. Supp.2d at 965(quoting *Cheers Sports Bar & Grill v. DIRECTV,* 563 F. Supp.2d 812, 819 (N.D. Ohio 2008)). Ohio law provides that a plaintiff must establish the following elements to prove unjust enrichment: (1) a benefit conferred by the plaintiff upon the defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *National/RS, Inc. v. Huff*, No. 10AP-306, 2010 WL 5550694 at *7 (Ohio Ct. App. Dec. 30, 2010)(citing *Hambleton v. R.G. Berry Corp.*, 465 N.E.2d 1298 (Ohio 1984)).

In addition to satisfying the above elements, a plaintiff must show that the substantial benefit is "causally related" to the substantial detriment to the plaintiff. *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003). Thus, a plaintiff's responsibility for her or his detrimental position breaks the required causal connection between the defendant's benefit and the plaintiff's loss. *Id.*(citing U.S. Health Practices, Inc. v. Blake, No. 00AP-1002, 2001 WL

-16-

277291 at *2 (Ohio App. Mar. 22, 2001)).

**Analysis**

Lemmon asserts that she was not paid for her work at the Subway. However, Ayres asserts that she was. There is a genuine issue of fact on whether Lemmon was paid money for working at the Subway.

Lemmon argues that she was to be compensated for her work at the Subway by receiving the Subway from Ayres. However, as determined above, there was no enforceable contract that required Ayres to give her the Subway real estate to her due to the Statue of Frauds.

Lemmon's primary duty at Ayres Accounting was work as an accountant. (Lemmon Dep. 26-30.) In addition, she performed other duties including solicitation and organizing for seminars, working on an addition to the building that Ayres owned, overseeing the sale of lottery tickets at a store that Ayres owned and managing the Subway. (Id. at 30, 33-34, 37.)

In addition to the salary that Lemmon received, there is evidence that she was paid a bonus at the end of each year, among other things, in recognition of her additional work responsibilities. (Ayres Dep. 33, 57-58.) Specifically, according to Ayres, because of her additional duties, including work at the Subway, Lemmon received a $4,500 year-end bonus in 2004, $6,000 in 2005[4], $4,210 in 2006 and $5,500 in 2007. (Ayres Aff.)

There is no evidence that Ayres promised to provide Lemmon a salary specifically for managing the Subway. Further, there is evidence that Lemmon at least doubted whether she would ever receive the Subway real estate. In addition, there is evidence that Lemmon began managing the Subway before Ayres promised to transfer the Subway real estate to her.

---

[4]The Subway opened in 2005.

-17-

Thus, regardless of whether Lemmon was compensated for managing the Subway, Lemmon cannot establish a causal connection between any benefit that Ayres received from her management of the Subway to the alleged failure of Ayres to pay her for managing the Subway. Lemmon managed the Subway without pay because she elected to do so. This conclusion is further supported by evidence that she did not ask to be paid compensation for managing the Subway until one month prior to leaving the position at the Subway. (Lemmon Dep. 209.) Thus, she is responsible for her detrimental position.

The Parties argue about whether Lemmon may claim unjust enrichment against Ayres and Ayres Accounting under the "alter ego" doctrine since the property on which the Subway was located was owned by a corporate entity, Richard E. Ayres, LLC, not named in this lawsuit. However, the Court need not reach these arguments.

There is a genuine issue of fact as to whether Lemmon was compensated in the form of a salary for her work at the Subway. However, she elected to mange the Subway without receiving a specific salary for doing so. Thus, she cannot claim that Ayres or Ayres Accounting was unjustly enriched by her management of the Subway. There are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Lemmon's Second Cause of Action for unjust enrichment.

## **Promissory Estoppel**

In her Third Cause of Action, Lemmon asserts that the Defendants have made promises to her which the Defendants should have reasonably expected to induce action and which did induce such action and which resulted in damages to her. The Defendants respond that this claim is deficient as a matter of law.

-18-

**Relevant Legal Provisions**

Under Ohio's promissory estoppel doctrine, a promise that the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and that does induce such action or forbearance is binding if one can avoid injustice only by enforcing the promise. *MMK* Group, 591 F. Supp.2d at 963. An Ohio promissory estoppel claim involves four elements: (1) a clear and unambiguous promise; (2) reliance by the party to whom the promise is made; (3) the reliance was reasonable and foreseeable; and (4) the party relying on the promise was injured by its reliance. *Gem*, 700 F. Supp.2s at 923.

**Analysis**

There are two (2) alleged promises at issue here. One is an alleged promise that Lemmon would be given the Subway real estate in return for managing the Subway. However, a promise to give the Subway real estate is not actionable due the Ohio's Statute of Frauds, as more fully discussed above.

If this promise was actionable pursuant to a promissory estoppel claim, it would fail because Lemmon now seeks monetary compensation and not the real estate. The remedy for this promissory estoppel would only be the real estate relied on or expected.

Further, Lemmon has not satisfied the reliance element of a promissory estoppel claim regarding the promise to give her the Subway real estate in return for managing the Subway. She testified that she did not believe that Ayres would give the Subway real estate to her. (Lemmon Dep. 149.) In support of this assertion, shortly after Ayres made the promise, on the advice of her financial advisor, she asked Ayres to make a commitment in writing in the form of a right of first refusal on the sale of the Subway real estate. (Id. at 149-50.) He refused to do so and Lemmon

-19-

never inquired further. (Id. at 79, 149.) Next, in the first year of their relationship, Ayres told Lemmon that he was not willing to leave his wife for her. (Id. at 161.) She interpreted this as a "red flag" about the Subway, but she continued in the "hope" that he would change his mind. (Id.) Finally, in 2007, Ayres considered changing the Subway to a different operation which Lemmon feared would not include her, causing her more "concerns" about the promise. (Id. at 154.) Yet, she continued to manage the Subway.

Lemmon argues that Ayres admitted that a motivator in making the promise to transfer the Subway real estate was to compensate Lemmon for her time worked at the Subway. However, Ayres has clarified the portion of his deposition relied upon by Lemmon before signing to confirm that the reason he gives is taking care of Lemmon as gratitude for her dedication and in hopes of a long-term relationship.

The second alleged promise is a promise by Ayres to pay Lemmon a salary for managing the Subway. Yet, Lemmon has identified no evidence that this promise was ever made by Ayres.

In sum, there is no evidence of a clear and unambiguous promise by Ayres to pay Lemmon a salary for managing the Subway. Further, Ayres' promise to transfer the Subway real estate is not actionable due to Ohio's Statute of Frauds. If it were actionable, there is unrefuted evidence that Lemmon did not rely upon it. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Lemmon's Third cause of action for promissory estoppel.

### Negligent Misrepresentation

In her Fourth Cause of Action, Lemmon asserts that the Defendants negligently supplied false information to her to persuade her in a way that was detrimental to her interests and

-20-

beneficial to the Defendants' interests. The Defendants respond that no present facts were either misrepresented or concealed.

## Relevant Legal Provisions

To be liable for a negligent misrepresentation claim under Ohio law, a defendant must (1) in the course of his business or other transaction in which he or she has a pecuniary interest, (2) supply false information (3) for the guidance of others in their business transactions (4) causing pecuniary loss to the plaintiff (5) while the plaintiff justifiably relied upon the information (6) and while the defendant failed to exercise reasonable care or competence in obtaining or communicating the information. *Gem*, 700 F. Supp.2d at 923. Further, the false information element requires a representation as to past or existing facts and not promises or representations relating to future actions or conduct. *Id.* Finally, although this concept is not limited to persons rendering professional opinions, Ohio courts have extended liability beyond persons rendering professional opinions only in special cases. *Bellios v. Victor Balata Belting Co.*, 724 F. Supp. 514, 519 (S.D. Ohio 1989).

## Analysis

In this case, Lemmon argues that she was made a promise by Ayres that was never intended to be carried out. The promise was that she would receive the Subway real estate. This, according to Lemmon, caused her to continue to manage the Subway without compensation. Also, according to Lemmon, this promise was based upon her extra hours worked at the Subway and not her relationship with Ayres.

Ayres promised to transfer the Subway real estate to Lemmon. It appears that he intended to make good on this promise when he made it because he changed his will accordingly. Thus,

-21-

there is no evidence that Ayres provided false information regarding his intent to transfer Subway real estate and there are no other alleged false promises.

Lemmon now says that this promise caused her to continue to manage the Subway without additional compensation. Yet there is evidence that she began to manage the Subway before the promise was made. Further, as set forth above, there is evidence that Lemmon did not justifiably rely upon the promise.

Finally, Lemmon alleges that Ayres' promise to give her the Subway real estate was based upon her extra hours worked and not on her relationship with Ayres. However, Lemmon testified that no mention was made of extra hours worked when the promise was made. Thus, she has identified no evidence of a promise to give her the Subway real estate in return for extra hours worked managing the Subway. In sum, Lemmon has not identified Rule 56 evidence that Ayres supplied false information to her.

Lemmon also has not identified evidence that she justifiably relied upon Ayres' promise to transfer the Subway real estate to her. She began managing the Subway before the promise was made and she did not believe that Ayres intended to transfer the real estate to her.

Lemmon has not identified any false information and she has identified evidence that she did not rely upon the information that she says was false. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Lemmon's Fourth Cause of Action for negligent misrepresentation.

### Negligent Concealment of Facts

In her Fifth Cause of Action, Lemmon asserts that the Defendants negligently concealed information from her to persuade her in a way that was beneficial to their interests and

detrimental to hers. The Defendants respond, as with the negligent misrepresentation claim, that no present facts were either misrepresented or concealed.

### Relevant Legal Provisions

A party that has a duty to disclose may be liable for negligent concealment. *Credit General Insurance Company v. Marine Midland Bank, N.A.*, No. C-3-86-561, 1992 WL 1258518 at *5-6 (S.D. Ohio Aug. 24, 1992); *Clemente v. Gardner*, No. 2002CA00120, 2004 WL 953700 at *4 (Ohio Ct. App. Apr. 26, 2004). A duty to disclose arises if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another party to act or refrain from acting and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading. *Miles v. Perpetual Savings & Loan Co.*, 388 N.E.2d 1367 at 1369 (Ohio 1979)(citing *Restatement of Torts 2d* 119, Section 551).

### Analysis

For this claim, Lemmon argues that Ayres concealed from her that he never intended to give her the Subway real estate. He allegedly did so to deceive Lemmon into performing free work managing the Subway.

If he did not intend to convey the Subway real estate to Lemmon, Ayres had a duty to disclose this information. However, as determined above, it appears that Ayres intended to make good on this promise to transfer the Subway real estate when he made it because he changed his will accordingly. Thus, there is no evidence that, at the time he made the promise, Ayres concealed from Lemmon that he never intended to give her the real estate. Further, as set forth above, there is evidence that Lemmon did not justifiably rely upon the promise.

-23-

Lemmon has identified no evidence showing that Ayres negligently concealed any material facts from her or that she justifiably relied upon the promise. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Lemmon's Fifth Cause of Action for negligent concealment.

### Fraudulent Misrepresentation

For her Sixth Cause of Action, Lemmon alleges that Ayres fraudulently misrepresented to her that she would receive the Subway real estate as compensation for managing the Subway. As with the other misrepresentation claims, the Defendants respond that no present facts were either misrepresented or concealed.

### Relevant Legal Provisions

In Ohio, the elements of a fraudulent misrepresentation claim are: (1) a representation, or where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such other disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying on it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. *National/RS, Inc. v. Huff*, No. 10AP-306, 2010 WL 5550694 at *5 (Ohio Ct. App. Dec. 30, 2010)(citing *Fifth Third Bank v. Cope*, 835 N.E.2d 779 (Ohio Ct. App. 2005)).

As a general rule, fraud cannot be predicated upon representations concerning future events because the representations regarding future events are more in the nature of predictions or opinions about what the future may hold. *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007). However, a promise made with a present intention not to perform, called promissory

-24-

fraud, is a misrepresentation of existing fact even if the promised performance is to occur in the future. *Id.* Yet, proof of nonperformance does not, alone, prove a lack of intent to perform. *Captiva, Inc. v. Viz Communications, Inc.*, 85 F. App'x 501, 506 (6th Cir. 2004).

### Analysis

In this case, there is evidence that Ayres promised Lemmon that the Subway real estate would be hers someday. There is also evidence that this promise was true when it was made and that Ayres made this promise as his gratitude for Lemmon's dedication and in hopes of a long-term relationship. Finally, there is evidence that Lemmon did not justifiably rely upon this promise. Thus, although it is a promise regarding a future event, Lemmon has not identified evidence that Ayres made the promise with a present intention not to perform. Finally, as set forth above, there is evidence that Lemmon did not justifiably rely upon the promise.

Therefore, the promise was not falsely made and there is no evidence that Lemmon justifiably relied upon the promise. There are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Lemmon's Sixth Cause of Action for fraudulent misrepresentation.

### Fraudulent Concealment

For her Seventh Cause of Action, Lemmon alleges that Ayres fraudulently concealed and/or did not disclose to her material facts regarding compensating her for her labor and transferring the Subway real estate to her. As with the other misrepresentation claims, the Defendants respond that no present facts were either misrepresented or concealed.

### Relevant Legal Provisions

To prevail on a fraudulent concealment claim in Ohio, the plaintiff must show: (1) actual

concealment of a fact; (2) with knowledge of the fact concealed; (3) intent to mislead another into relying upon such conduct; (4) followed by actual reliance thereon by such other person having the right to so rely; (5) with injury due to the reliance. *Goddard v. Stabile*, 924 N.E.2d 868, 874 (Ohio Ct. App. 2009).

### Analysis

Lemmon alleges that Ayres concealed a fact that he wanted her to manage the Subway as compensation for transferring the Subway real estate to her, which he denies. However, Lemmon has not presented evidence that shows the actual concealment of a fact.

There is no evidence that Ayres concealed that he wanted her to manage the Subway in return for promising her the real estate, which he denies. The evidence presented is that Ayres promised to transfer the Subway real estate to Lemmon as his gratitude for Lemmon's dedication and in hopes of a long-term relationship and that this promise was factual when made. Finally, as set forth above, there is evidence that Lemmon did not justifiably rely upon the promise.

Thus, Lemmon has not identified evidence that satisfies all of the elements of a fraudulent concealment claim. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Lemmon's Seventh  Cause of Action for fraudulent concealment.

### **IIED**

For her Eighth Cause of Action, Lemmon alleges that Ayres' actions caused her to suffer psychological injuries and mental anguish resulting in serious emotional distress. The Defendants respond that Lemmon cannot present evidence of the required elements of an IIED claim.

**Relevant Legal Provisions**

The Ohio Supreme Court has defined the tort of IIED as,

> One who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*Crable v. Nestle USA, Inc.*, No. 86746, 2006 WL 15555405 at *8 (Ohio Ct. App. June 8, 2006)(quoting *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 453 N.E.2d 666, syllabus (Ohio 1983)). The elements of an IIED claim are: (1) the defendant either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it would be considered utterly intolerable in a civilized community; (3) the defendant's actions were the proximate cause of plaintiff's psychic injury; and (4) the mental distress suffered by plaintiff is serious and of such a nature that no reasonable person could be expected to endure it. *Id.*

Serious emotional distress is emotional injury which is both severe and debilitating. *Id.*(citing *Paugh v. Hanks*, 451 N.E.2d 759 (Ohio 1983)). Examples of serious emotional distress include traumatically induced neurosis, psychosis, chronic depression and phobia. *Id.*

**Analysis**

First, Lemmon has not identified evidence showing that Ayres either intended to cause emotional distress or knew or should have known that the actions he took would result in serious emotional distress. She also has not identified evidence that Ayres' conduct was extreme and outrageous.

Lemmon argues that Ayres held their relationship out as a bartering piece for himself and took away the one thing she had been working for all along, the Subway real estate. She also argues that Ayres used his power as Lemmon's employer to receive free managerial work at the Subway. However, the evidence submitted shows that Ayres promised the Subway real estate to Lemmon because of his relationship with Lemmon and then changed his will to retract that promise after Lemmon ended that relationship. Lemmon also testified that she did not think that Ayres intended to physically harm her.

Thus, there is no evidence that Ayres intended to harm Lemmon. Also, there is no evidence from which a reasonable trier of fact could conclude that Ayres conduct was extreme and outrageous. Ayres' advances were not unwelcomed, and Lemmon actively participated in the relationship.

Finally, Lemmon has not identified evidence that she suffered serious mental distress of such a nature that no reasonable person could be expected to endure it. At best, she has identified, her own statements, that she experienced nervousness, fear of potentially losing her job, fear that her future was gone, and being taken advantage of. (Lemmon Dep. 187.) But, she did not seek any treatment for emotional distress and she was working at the time. (Id. at 185.) Thus, no facts have been identified from which a reasonable juror could conclude that Lemmon suffered a severe and debilitating emotional injury.

Lemmon has not presented evidence that satisfies at least three of the elements of an IIED claim. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Lemmon's Eighth Cause of Action for IIED.

**Assault**

-28-

For her Ninth Cause of Action, Lemmon alleges that Ayres assaulted her by wilfully attempting to touch her offensively. The Defendants respond that Lemmon cannot satisfy the elements of an assault claim.

### Relevant Legal Provisions

An assault, under Ohio law, is "the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact." *Retterer v. Whirlpool Corp.*, 677 N.E.2d 417, 421 (Ohio Ct. App. 1996)(quoting *Smith v. John Deere Co.*, 614 N.E.2d 1148, 1154 (Ohio Ct. App. 1993)). The alleged tortfeasor must have known with substantial certainty that his or her act would be harmful or offensive conduct. *Id.* Also, to be offensive conduct, the contact or attempt must be offensive to a reasonable sense of personal dignity. *Id.*

### Analysis

Lemmon bases her assault and battery claims on the times after she thought the relationship with Ayres was over, that he would put his hand down her shirt and come up from behind and kiss her. (Lemmon Dep. 164.) She specifically remembers a time at the Subway when she was physically disabled and Ayres lifted her head up and started kissing her. (Id. at 165.) She also specifically remembers Ayres putting his hands down her shirt one time after tax season in 2008. (Id. at 166-67.)

To prove assault, Lemmon must present evidence that Ayres intended to harm her and that she was placed in fear of the contact. In this case, there is no evidence that Ayres intended to physically harm Lemmon. Lemmon testified that she was not afraid that Ayres would physically harm her. (Id. at 169.)

The absence of any intent to injure is also evident from Lemmon's testimony. During their relationship, Lemmon initiated sex with Ayres and told him she loved him. (Id. at 136-37.) Throughout their relationship, Ayres performed the same acts that Lemmon now complains about. (Id. at 169-70.) She never objected or indicated any displeasure at Ayres' actions. (Id. at 168, 170.) She never told him that she did not want to continue the relationship. (Id. at 67, 168, 170.)

Thus, Lemmon has not identified evidence from which a reasonable juror could conclude that Ayres assaulted her. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Lemmon's Ninth Cause of Action for assault.

### Battery

For her Tenth Cause of Action, Lemmon alleges that Ayres intentionally made unconsented contact with her. The Defendants respond that Lemmon cannot satisfy the elements of a battery claim.

### Relevant Legal Provisions

Under Ohio law, battery occurs when an individual "acts intending to cause a harmful or offensive contact and when a harmful contact results." *Retterer*, 677 N.E.2d at 421(quoting *Love v. City of Port Clinton*, 524 N.E.2d 166, 167 (Ohio Ct. App. 1988)). Also, to be offensive conduct, the contact must be offensive to a reasonable sense of personal dignity. *Id.*

### Analysis

The allegations that form the basis for Lemmon's assault claim are the same as those that form the basis for her battery claim. Based upon these allegations, as determined above, a

reasonable juror could not conclude that Ayres intended to harm Lemmon. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Lemmon's Tenth Cause of Action for battery.

### Sexual Harassment

For her Eleventh Cause of Action, Lemmon alleges that Ayres committed hostile-environment sexual harassment which was unwelcomed by her. The Defendants respond that Ayres' conduct was not unwelcome, that Ayres' conduct was not severe or pervasive and that a reasonable person would not consider Ayres' conduct to be hostile or abusive.

### Relevant Legal Provisions

Ohio Revised Code § 4112.02(A) prohibits an employer from discriminating against an employee with regard to any matter directly or indirectly related to the employment because of the employee's sex. *Godsey-Marshall v. Village of Phillipsburg*, No. 23687, 2010 WL 2017909 at *3 (Ohio Ct. App. May 21, 2010). Sexual harassment violates the statute only if it amounts to discrimination because of sex. *Id.* Finally, courts are to interpret issues in cases brought pursuant to Ohio Rev. Code Chapter 4112 using federal Title VII case law. *Little Forest Medical Center of Akron v. Ohio Civil Rights Commission,* 575 N.E.2d 1164 (Ohio 1991).

There are two types of sexual harassment. *Kauffman v. Allied Signal, Inc., Autolite Division*, 970 F.2d 178, 182 (6th Cir. 1992). One is harassment that creates an offensive or hostile work environment and the other is quid pro quo harassment where a supervisor demands sexual favors as a condition for job benefits. *Id.*

In this case, Lemmon asserts and argues that the alleged sexual harassment created an offensive or hostile work environment and that the alleged sexual harassment was directly linked

to the grant or denial of a tangible economic benefit. Thus, Lemmon has alleged both types of sexual harassment.

Ayres presents arguments regarding a hostile work environment claim but says nothing about a quid pro quo claim. Lemmon responds to Ayres' arguments regarding a hostile work environment claim but says nothing about a quid pro quo claim. However, at least three of the elements of the two claims are the same.

Hostile Work Environment Sexual Harassment

To prove a claim for hostile work environment sexual harassment, a plaintiff must prove: (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) the harassing conduct had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (5) either the harassment was committed by a supervisor or the harassment was committed by a non-supervisor employee and the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action. the defendant-employer may be held liable for the harassment. *Id.*

When assessing whether the conduct complained of is sufficiently severe or pervasive, a court is to view the work environment as a whole and consider the totality of the circumstances. *Bell v. Berryman*, No. 03AP-500, 2004 WL 1964915 at *13 (Ohio Ct. App. Sept. 7, 2004). To show that harassing conduct was severe or pervasive, a plaintiff must show that: (1) the harassment affects the terms and conditions or privileges of employment; (2) the harassment is

-32-

objectively severe, that is a reasonable person in that plaintiff's position must think it severe; and (3) the plaintiff perceives the environment to be abusive. *Godsey-Marshall*, 2010 WL 2017909 at *4. Further, the conduct at issue must be unwelcome in that the plaintiff neither solicited it nor invited it and regarded the conduct as undesirable or offensive. *Bell*, 2004 WL 1964915 at *14 Finally, an employer may be held liable when either the harassment was committed by a supervisor or the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Godsey-Marshall*, 2010 WL 2017909 at *4.

To be actionable, alleged hostile work environment sexual harassment must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Takach v. American Medical Technology, Inc.*, 715 N.E.2d 577, 582 (Ohio Ct. App. 1998). Courts consider the following factors when determining whether a work environment was objectively hostile or abusive: the frequency of the discriminatory conduct; the severity of the conduct; whether the conduct was physically threatening or humiliating and whether it unreasonably interferes with an employee's performance. *Id.* at 583.

The fact that sex-related conduct was voluntary is not a defense to a sexual harassment action. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986). The correct question for the court is whether the respondent by her conduct indicated that the alleged sexual advances were unwelcome. *Id.*

Quid Pro Quo Sexual Harassment

To prove a claim for quid pro quo sexual harassment, a plaintiff must prove: (1) that the employee was a member of a protected class; (2) that the employee was subjected to

-33-

unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3)

that the harassment complained of was based on sex; (4) that the employee's submission to the

unwelcomed advances was an express or implied condition for receiving job benefits or that the

employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job

detriment; and (5) the existence of respondeat superior liability. *Kauffman*, 970 F.2d at 186. "In a

quid pro quo sexual harassment action, an employer is held strictly liable for the conduct of

supervisory employees having plenary authority over hiring, advancement, dismissal and

discipline under the theory of respondeat superior." *Highlander v. K.F.C. National Management*

*Company*, 805 F.2d 644, 648 (6th Cir. 1986)(citing *Henson v. City of Dundee*, 682 F.2d 897, 910

(11th Cir. 1982)).

### Analysis

Hostile Work Environment

Lemmon testified that the sexual harassment by Ayres started the very first day that he

grabbed her but that, for the most part, her claim is for pretty much all of 2008. (Lemmon Dep.

182.) She bases her sexual harassment claim on the alleged fact that Ayres kept pursuing her

when she did not want to be pursued anymore. (Id. at 183.)

In her Response Brief, Lemmon asks the Court to only consider Ayres' actions during

2008. However, the law requires the Court to consider the work environment as a whole and the

totality of the circumstances.

First, based upon the Rule 56 evidence identified by the Parties, Lemmon's actions

demonstrate that Ayres' conduct was not unwelcome. The evidence indicates that, for five (5)

years, Lemmon participated in and even encouraged the very conduct that she now wishes to

characterize as unwelcomed. Also, she never told Ayres that the relationship had ended. (Id. at 67, 161, 170.) When Ayres' approached Lemmon, she never told him that the conduct was unwelcome and she never objected or protested in any way. (Id. at 168, 170.)

Second, based upon the Rule 56 evidence identified by the Parties, Ayres' conduct was not severe or pervasive. Lemmon testified that she never feared for her personal safety or felt physically threatened and she testified that her work performance never suffered in any way. (Id. at 58-59, 169, 187-88.) Further, the acts that Ayres' did in 2008 are the same acts that he did prior to 2008 and they were not unwelcome prior to 2008. After participating in the acts and never telling Ayres that she was uncomfortable with the same conduct, she now claims that the acts were severe and abusive.

Third, Ayres' conduct would not be unwelcome to an objectively reasonable person. Lemmon actively participated in creating the environment. Further, she admits that she never told Ayres to cease the conduct. Finally, she was not threatened by Ayres' behavior in any way.

Lemmon has not identified evidence from which a reasonable person could conclude that Ayres' conduct was unwelcome, that Ayres' conduct was severe or pervasive or that Ayres' conduct was unwelcome to an objectively reasonable person. Thus, Lemmon has not identified evidence from which a reasonable person could conclude that Ayres' conduct constituted hostile work environment sexual harassment.

### Quid Pro Quo Sexual Harassment

Lemmon presents the same arguments regarding her quid pro quo claim as she does for her hostile work environment claim and the results are the same. She has not identified evidence from which a reasonable person could conclude that Ayres' conduct was unwelcome. She also

has not identified evidence from which a reasonable person could conclude that she refused to submit to any of Ayres' sexual demands. Thus, Lemmon has not identified evidence from which a reasonable person could conclude that Ayres' conduct constituted quid pro quo sexual harassment.

### Conclusion

Lemmon has not identified evidence from which a reasonable person could conclude that she has satisfied all of the elements of either a hostile work environment sexual harassment claim or a quid pro quo sexual harassment claim. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Lemmon's Eleventh Cause of Action for sexual harassment.

### **FLSA Claim**

For her Twelfth Cause of Action, Lemmon alleges that the Defendants violated the FLSA when they failed to pay her overtime wages. The Defendants respond that Lemmon was exempt from receiving overtime.

### Relevant Legal Provisions

The FLSA forbids an employer from working employees longer than forty (40) hours in a work week unless the employee is paid overtime wages. 29 U.S.C. § 207(a)(1). However, employees in bona fide executive, administrative or professional capacities are exempt for the overtime requirement. 29 U.S.C. § 213(a)(1). Finally, an employee is exempt if they perform a combination of exempt duties under these different exemptions. 29 C.F.R. § 541.708.

To qualify for the executive exemption, an employee must be compensated on a salary basis at a rate of not less than $455 per week and the employee's primary duty must be the

management of the enterprise in which the employee is employed. 29 C.F.R. §§ 541.100(a). The employee in a bona fide executive capacity also customarily and regularly directs the work of two or more other employees and has the authority to hire or fire other employees. Id.

To qualify for the administrative exemption, an employee must be compensated on a salary basis at a rate of not less than $455 per week and an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer. 29 C.F.R. § 541.210(a). Work directly related to management or general business operations includes work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; and legal and regulatory compliance. 29 C.F.R. § 541.210(b).

To qualify for the learned professional exemption, an employee must be compensated on a salary basis at a rate of not less than $455 per week and the employee must be performing work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. 29 C.F.R. § 541.301(a). "Work requiring advanced knowledge" means work which is predominantly intellectual in character and which includes work requiring the consistent exercise of discretion and independent judgment as distinguished from the performance of routine mental, manual, mechanical or physical work. § 541.301(b).

The exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various

possibilities have been considered. 29 C.F.R. § 541.202(a). However, the fact that an employee's decisions are subject to review does not preclude the exercise of discretion and judgment. 29 C.F.R. § 541.202(c).

To qualify for any of the exemptions, an employee's "primary duty" must be the performance of exempt work.  29 C.F.R. § 541.700(a). Factors to consider when determining primary duty include the relative importance of the exempt duties as compared with other types of duties, the amount of time spent performing exempt work, the employee's relative freedom from direct supervision and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.  29 C.F.R. § 541.700(a).

Employees who spend more than fifty (50) percent of their time performing exempt work generally satisfy the primary duty requirement. 29 C.F.R. § 541.700(b). However, employees who do not spend more than fifty (50) percent of their time performing exempt duties may meet the primary duty requirement if the other factors support such a conclusion. 29 C.F.R. § 541.700(b).

## Analysis

Ayres first asserts that Lemmon's accounting duties were exempt under both the administrative and the professional exemptions. To be subject to the administrative exemption, Lemmon's primary duty must have been the performance of work directly related to the management or general business operations of Ayres Accounting. To be subject to the professional exemption, Lemmon's primary duty must have been the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired

-38-

by a prolonged course of specialized intellectual instruction or requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor. For either exemption to apply, Lemmon must be compensated on a salary basis of not less than $455 per week.

Ayres testifies that Lemmon was paid on a salary basis beginning in 2006, and her salary was never less than $455 per week. (Ayres Aff.) Lemmon testified that she was paid on an hourly basis. (Lemmon Dep. 244.) Finally, both Lemmon and Ayres testified that Lemmon was guaranteed payment for forty (40) hours per week, even if she worked less, and Lemmon testified that her salary was never reduced even if she worked less than eighty (80) hours in a two-week period. (Lemmon Dep. 242-44, Ayres Dep. 118, 128.) Thus, the evidence indicates that Lemmon was paid on a salary basis beginning in 2006.

Lemmon argues that she was not on salary because for one week in 2007 she was paid hourly for less than 80 hours in a two-week pay period. As evidence supporting this argument, she provides what appears to be an accounting spreadsheet. However, this accounting spreadsheet does not show that Lemmon was paid on an hourly basis nor does it show that she was paid for less than 80 hours per week. One entry for 12/23/07 indicates what could be assumed, but is not specifically identified, to be 79.75 hours. However, the accounting spreadsheet also indicates that Lemmon was paid $1248 for that two-week period. In sum, the accounting spreadsheet provided by Lemmon is not evidence that she was paid on a hourly basis instead of a salary basis.

In this case, Lemmon's primary duties at Ayres accounting included keeping accounting records, preparing financial reports, and preparing, and amending when necessary, all types of tax returns for certain clients. These duties qualify Lemmon for the administrative exemption.

*See Zalewski v. PNC Financial Services Group*, 555 F. Supp.2d 555, 564 (W.D. Pa. 2008)(staff accountant who complied reports for filings and audits, analyzed balance sheets and income statements, verified financial reports and monitored investments was exempt administrative employee).

The Defendants also argue that Lemmon's work as an accountant was exempt under the professional employee exemption. Lemmon's primary duty at Ayres Accounting was her work as an accountant. Federal regulations specifically include "accounting" as a "work requiring advanced knowledge." 29 C.F.R. § 541.300.

The evidence indicates that Lemmon was exempt from receiving overtime while working as an accountant. She was compensated on a salary basis of more than $910 per bi-weekly pay period and she was qualified for both the administrative and professional exemptions.

The Defendants second assertion is that Lemmon's management duties at the Subway were exempt under both the administrative and executive exemptions. To be subject to the administrative exemption, Lemmon's primary duty must have been the performance of work directly related to the management or general business operations of the Subway. To be subject to the executive exemption, Lemmon's primary duty must have been the management of the Subway and she must have regularly directed the work of two or more employees and had the authority to hire and fire employees. For either exemption to apply, Lemmon must have been compensated on a salary basis of not less than $455 per week.

Lemmon argues that she was not compensated on a salary basis of not less than $455 per week for her work managing the Subway because she was never paid for any of her work managing the Subway, whether by salary or by the hour. Further, she did not keep a record of the

-40-

hours she worked managing the Subway. With no record of hours worked and, if Lemmon is believed, no record of an hourly rate, overtime compensation cannot be reasonably calculated, and a claim for compensation for this overtime cannot reasonably be adjudicated.

### Conclusion

Lemmon was exempt from receiving overtime as required by the FLSA for her accounting work at Ayres Accounting under both the administrative and professional exemptions. Also, Lemmon has testified that she was not compensated for working at the Subway. Since overtime pay for uncompensated hours is a meaningless concept, a claim for such cannot reasonably be adjudicated. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Lemmon's Twelfth Cause of Action for violation of the FLSA.

### O.R.C. § 4113.03 Claim

For her Thirteenth Cause of Action, Lemmon alleges that the Defendants violated Ohio Rev. Code § 4113.03 when they failed to pay her overtime wages. The Defendants respond that Lemmon was exempt from receiving overtime.

### Relevant Legal Provisions

Ohio Rev. Code § 4113.03 is Ohio's version of the FLSA. It provides that an employer must pay overtime wages for hours work in excess of forty (40) in one week. Ohio Rev. Code § 4111.03(A). This provision is subject to the exemptions provided in the FSLA. Id

The FLSA includes certain exemptions from the overtime requirement, all of which are adopted by Ohio Rev. Code § 4113.03. Thus the merits of Lemmon's federal and state overtime claims are the same. No Party argues otherwise.

**Analysis**

As determined above, Lemmon was exempt from receiving overtime as required by the FLSA for her accounting work at Ayres Accounting under both the administrative and professional exemptions. Also, Lemmon's claim for overtime compensation for her work managing the Subway cannot be adjudicated. Thus, she was exempt from receiving overtime under Ohio Rev. Code § 4113.03. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Lemmon's Thirteenth Cause of Action for violation of Ohio Rev. Code § 4113.03.

**<u>Vicarious Liability</u>**

For her Fourteenth Cause of Action, Lemmon alleges that Ayres Accounting is vicariously liable for Ayres' tortious acts committed while he was acting within the course and scope of his employment. However, Lemmon has not identified any tortious acts committed by Ayres. Therefore, there are no acts for which Ayres Accounting may be held vicariously liable. As a result, there are no genuine issues of material fact and Ayres Accounting is entitled to judgment as a matter of law on Lemmon's Fourteenth Cause of Action for vicarious liability.

**<u>Negligent Training and/or Supervision</u>**

For her Fifteenth Cause of Action, Lemmon alleges that Ayres Accounting negligently trained and/or supervised Ayres. Ayres Accounting responds that there is no evidence of negligence and no underlying unlawful conduct.

**Relevant Legal Provisions**

The elements of a negligent supervision claim are: (1) an employment relationship; (2) incompetence of the employee; (3) actual or constructive knowledge of the incompetence by the

employer; (4) an act or omission by the employee which caused the plaintiff's injuries; and (5) negligent retention of the employee by the employer. *Crable v. Nestle USA, Inc.*, No. 86746, 2006 WL 1555405 at *6 (Ohio Ct. App. Jun. 8, 2006). An underlying requirement for an action for negligent training and/or supervision is that the employee is individually liable for a tort or guilty of a claimed wrong against the plaintiff. *Godsey-Marshal*l, 2010 WL 2017909 at * 8.

### Analysis

In this case, Lemmon has not identified evidence that Ayres is liable for a tort or guilty of a claimed wrong against her. Therefore, her negligent supervision claim must fail. As a result, there are no genuine issues of material fact and Ayres Accounting is entitled to judgment as a matter of law on Lemmon's Fifteenth Cause of Action for negligent training and/or supervision.

### SUMMARY

The Defendants are entitled to summary judgment on Lemmon's breach-of-contract claim because Lemmon has not identified evidence that an actionable oral agreement existed. The Defendants are entitled to summary judgment on Lemmon's unjust enrichment claim because Lemmon has not identified evidence that the alleged benefit conferred on Ayres has a causal relationship to her managing the Subway without monetary compensation. The Defendants are entitled to summary judgment on Lemmon's promissory-estoppel claim because Lemmon has not identified evidence of a clear and unambiguous, actionable promise that she reasonably relied upon to her detriment. The Defendants are entitled to summary judgment on Lemmon's claims involving alleged misrepresentations and concealments because she has not identified evidence that satisfies all of the elements of the misrepresentation and concealment claims. The Defendants are entitled to summary judgment on Lemmon's IIED and sexual

-43-

harassment claims because she has not identified evidence that supports all of the elements of each of these claims. The Defendants are entitled to summary judgement on Lemmon's assult and battery claims because Lemmon has not identified evidence from which a reasonable trier of fact could conclude that Ayres assaulted her. The Defendants are entitled to summary judgment on Lemmon's federal and state overtime claims because there is evidence that she was exempt from receiving overtime and she has not presented evidence to the contrary, and because her claim for overtime pay for managing the Subway cannot be adjudicated. Finally, Ayres Accounting, one of the Defendants, is entitled to summary judgment on Lemmon's vicarious-liability and negligent-training and/or supervision claims because she has not identified evidence of an underlying wrongful act.

The Defendants' Motion for Summary Judgment (doc. #26) is GRANTED. None of Lemmon's claims remain to be adjudicated. Thus, the captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio this 16th day of March, 2012.

>                                   **s/Thomas M. Rose**
> _____
> THOMAS M. ROSE, JUDGE
> UNITED STATES DISTRICT